**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| NATURAL RESOURCES DEFENSE COUNCIL<br>1200 New York Avenue, NW, Suite 400<br>Washington, DC 20005 | )<br>)<br>)<br>) |
|     Plaintiff, | )<br>) |
| v. | ) Civil Action No: _____<br>) |
| UNITED STATES ENVIRONMENTAL<br>PROTECTION AGENCY, and<br>MARIANNE LAMONT HORINKO, ACTING<br>ADMINISTRATOR, UNITED STATES<br>ENVIRONMENTAL PROTECTION AGENCY,<br>1200 Pennsylvania Avenue, NW<br>Ariel Rios Building<br>Washington, DC  20460 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
|     Defendants. | )<br>)<br>) |

<u>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**</u>

**INTRODUCTION**

1.    Plaintiff the Natural Resources Defense Council (NRDC) seeks declaratory and

injunctive relief against defendants, the U.S. Environmental Protection Agency and

Marianne Lamont Horinko, Acting Administrator of the U.S. Environmental Protection

Agency (collectively, EPA), for failing to comply with their statutory obligations to

prevent jeopardy to endangered species caused by EPA's continued registration of the

pesticide atrazine.   EPA has failed to consult with the Fish and Wildlife Service (FWS)

and National Marine Fisheries Service (NMFS), as required by section 7(a)(2) of the

Endangered Species Act (ESA), 16 U.S.C. § 1536(a)(2), to ensure that its registration of atrazine will not jeopardize the survival and recovery of endangered amphibians, reptiles, fish, and aquatic invertebrates nationwide.

2.    EPA's atrazine registration may jeopardize the following endangered species: loggerhead turtle, leatherback turtle, green turtle, Kemp's ridley turtle, shortnose sturgeon, and dwarf wedge mussel in the Chesapeake Bay and its watershed; the pallid sturgeon, Topeka shiner, fat pocketbook pearly mussel, purple cat's paw pearly mussel, and northern riffleshell in Midwestern rivers and their tributaries; and the Barton Springs salamander, Alabama sturgeon, pink mucket pearly mussel, shiny pigtoe pearly mussel, fine-rayed pigtoe mussel, rough pigtoe mussel, heavy pigtoe mussel, ovate clubshell mussel, southern clubshell mussel, and stirrup shell mussel in rivers and streams in the South.

3.    NRDC seeks a judgment declaring that EPA has violated the ESA by failing to comply with the consultation requirements of ESA section 7(a)(2).  NRDC seeks an injunction ordering EPA to consult with FWS and NMFS regarding the effects of atrazine on endangered species and their habitat.  NRDC further seeks an injunction prohibiting EPA from allowing atrazine uses that result in atrazine entering the habitat of endangered species until the consultation process has been completed and EPA has brought its atrazine registration into compliance with ESA section 7(a)(2).

**JURISDICTION AND VENUE**

4.    This Court has jurisdiction pursuant to the ESA citizen suit provision, 16 U.S.C. § 1540(g), to enjoin violations of the ESA and its implementing regulations.  This action is brought to address defendants' violations of federal law.

5.      As required by the ESA, 16 U.S.C. § 1540(g)(2)(A), NRDC provided 60 days' notice of

        its intent to sue by letter delivered to EPA, as well as the Department of Interior and

        Department of Commerce, on May 20, 2003.  EPA has not remedied the violations set

        forth in the 60-day notice letter.

6.      Venue is proper in the United States District Court for the District of Maryland pursuant

        to 16 U.S.C. § 1540(g)(3)(A) and 28 U.S.C. § 1391(e), because a substantial part of

        defendants' violations of the ESA occurred in this district, and injury to NRDC and its

        members occurred and continues to occur in this district.

## THE PARTIES

7.      Plaintiff NRDC is a non–profit, environmental membership organization with more than

        465,000 members nationwide.  NRDC maintains headquarters in New York City and

        additional offices in Washington D.C., Los Angeles, and San Francisco.  NRDC's

        membership and staff of lawyers, scientists, and other environmental specialists have a

        long-standing interest in protecting endangered species, and in improving the regulation

        of pesticides and other toxic chemical contaminants.  NRDC seeks to ensure that

        pesticide regulation is protective of the environment and public health and in compliance

        with governing statutes.

8.      NRDC's members use and enjoy the Chesapeake Bay and its rivers and tributaries

        throughout Maryland, Virginia, and Pennsylvania for recreational, scientific, aesthetic,

        and cultural purposes.  NRDC's members also use and enjoy the Missouri, Mississippi,

        and Green Rivers and their tributaries in the Midwest, Barton Springs and its watershed

        in Texas, and the Alabama River, its tributaries, and other rivers and streams throughout

3

Alabama, for recreational, scientific, aesthetic, and cultural purposes.  NRDC's members

derive, or, but for the endangered status of listed species, would derive, recreational,

scientific, aesthetic, and cultural benefits from the existence in the wild of endangered sea

turtles, amphibians, fish, and mussels through wildlife observation, study, photography,

and recreation.  The past, present, and future enjoyment of these benefits by NRDC's

members has been, is, and will continue to be irreparably harmed by EPA's disregard of

its statutory duties under the ESA.

9.     Defendant EPA is the federal agency charged with registering pesticides under the

Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) and with ensuring that the

pesticide uses it authorizes will not have unreasonable adverse effects on the

environment, including on endangered species and their habitat.  7 U.S.C. §§ 136-136y.

EPA is further charged with complying with the ESA with respect to its programs,

authorities, and actions.  16 U.S.C. § 1536.

10.    Defendant Marianne Lamont Horinko is the Acting Administrator of the Environmental

Protection Agency.  She is sued in her official capacity.

**RELEVANT STATUTORY PROVISIONS**

I.     SECTION 7(a)(2) CONSULTATIONS TO PREVENT JEOPARDY TO
       ENDANGERED SPECIES.

11.    The Supreme Court has described the Endangered Species Act as "the most

comprehensive legislation for the preservation of endangered species ever enacted by any

nation."  *TVA v. Hill*, 437 U.S. 153, 180 (1978).  According to the Supreme Court, "[t]he

plain intent of Congress in enacting this statute was to halt and reverse the trend toward

species extinction, whatever the cost." *Id.* at 184.  The ESA "shows clearly that Congress viewed the value of endangered species as 'incalculable.'" *Id.* at 187.

12.   Section 7(a)(2) of the ESA requires that "[e]ach federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an 'agency action') is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary . . . to be critical."  16 U.S.C. §1536(a)(2).

13.   To ensure compliance with this statutory mandate, EPA must consult with the appropriate fish and wildlife agency – NMFS for marine species, FWS in the case of terrestrial or freshwater organisms – whenever its actions "may affect" an endangered or threatened species.  *See* 50 C.F.R. § 402.14.  FWS and NMFS share responsibility for administering the ESA as it relates to some species, including sea turtles.

14.   This interagency consultation process assists EPA (and other federal agencies) in complying with its duty to ensure against jeopardy to endangered or threatened species or destruction or adverse modification of critical habitat.

15.   Regulations implementing section 7 of the ESA broadly define the scope of agency actions subject to consultation to encompass "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," including the promulgation of regulations and the granting of licenses.  50 C.F.R. § 402.02 (definition of "action").

16.    EPA must consult concerning ongoing agency actions over which EPA retains, or is
       authorized to exercise, discretionary involvement or control.  *See, e.g.,* 50 C.F.R. §
       402.16 (reinitiation of consultation).  EPA must also consult concerning ongoing agency
       actions "if a new species is listed . . . that may be affected by the identified action."  *Id*.

17.    To initiate consultation, EPA must assess the impacts of the action on listed species and
       their habitat and provide all relevant information about such impacts to the expert fish
       and wildlife agency.  50 C.F.R. § 402.14(c).  The ESA provides for formal consultations,
       culminating in the issuance of a biological opinion by FWS or NMFS.  By regulation,
       FWS and NMFS have provided that, if EPA determines that an action "may affect," but
       is "not likely to adversely affect" the listed species or its critical habitat, the consultation
       may be resolved without preparation of a biological opinion if the FWS or NMFS, as
       appropriate, concurs in writing in that determination.  *Id.* § 402.13.  If FWS or NMFS do
       not concur, or if EPA has determined that the action is "likely to adversely affect" the
       listed species, the agencies must conduct a formal consultation.  *Id.* §§ 402.02, 402.14(a).

18.    To initiate formal consultation, EPA must assess the impacts of the action on listed
       species and their habitat and provide all relevant information about such impacts,
       including the best scientific and commercial data available, to the expert fish and wildlife
       agency.  16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.14.

19.    The end product of formal consultation is a biological opinion in which FWS or NMFS
       must determine whether the action will jeopardize the survival of a listed species or will
       adversely modify the species' critical habitat.  16 U.S.C. § 1536(b).  In preparing the
       biological opinion, FWS or NMFS must review all relevant information and provide a

detailed evaluation of the action's effects on the listed species and critical habitat,

including the cumulative effects of federal and nonfederal activities in the area.  16

U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(g)-(h).

II.     EPA'S ONGOING REGULATION OF PESTICIDES UNDER FIFRA.

20.     The Federal Insecticide, Fungicide and Rodenticide Act (FIFRA) requires that pesticides

must be registered by EPA in order to be sold or distributed in the United States.  7

U.S.C. § 136a.  FIFRA section 4, as amended in 1988, requires EPA to complete a review

and reregistration of previously registered pesticides.  7 U.S.C. § 136a-1.  Under FIFRA

sections 3 and 4, EPA may not register or reregister a pesticide unless the chemical will

perform its intended function without causing any "unreasonable adverse effects on the

environment."  7 U.S.C. §§ 136a(c)(5)(C), 136a-1(g)(2)(C).

21.     Central to the registration process is EPA's approval of a label for the particular

pesticide.  FIFRA makes it unlawful to use a pesticide in a manner inconsistent with the

label, 7 U.S.C. § 136j(a)(2)(G), or to make any claims that differ substantially from the

label.  7 U.S.C. § 136j(a)(1)(B).

22.     EPA must classify pesticides as general or restricted use pesticides, depending on the

risks posed to human health and the environment.  When necessary to guard against

unreasonable adverse health or environmental effects, EPA must classify or reclassify a

pesticide as restricted use.  7 U.S.C. § 136a(d)(1)(C).  Restricted use pesticides are

subject to additional regulatory restrictions, particularly concerning application of the

pesticide.

23.     After approving a pesticide registration, EPA retains discretionary involvement and
        control over that registration.  EPA must periodically review each pesticide registration
        every 15 years.  7 U.S.C. § 136a(g)(1) ("registration review").  EPA has the authority to
        compel pesticide registrants to submit data necessary to conduct the registration review.
        7 U.S.C. § 136a(g)(2).  Registrants must also submit to EPA any information about
        registered pesticides' unreasonable adverse effects on the environment.  7 U.S.C. §
        136d(a)(2).  EPA takes such information into account in reviewing and, where necessary,
        modifying pesticide registrations.

24.     Pursuant to FIFRA section 4, EPA is in the process of reregistering pesticides that have
        been on the market for years and often decades.  7 U.S.C. § 136a-1.  As part of a
        reregistration determination, EPA is required to impose restrictions on uses of the
        pesticides that cause unreasonable health or environmental effects, including those uses
        that cause harm to threatened or endangered species.

25.     The EPA Administrator has the authority to cancel pesticide registrations whenever "a
        pesticide or its labeling or other material required to be submitted does not comply with
        the provisions of this Act or, when used in accordance with widespread and commonly
        recognized practice, generally causes unreasonable adverse effects on the environment."
        7 U.S.C. § 136d(b).  The Administrator may immediately suspend a pesticide registration
        to prevent an imminent hazard.  7 U.S.C. § 136d(c).

26.     EPA has acknowledged that the ESA section 7(a)(2) duty to consult applies to its ongoing
        pesticide registration activities and that it "must consult with FWS or NMFS regarding
        the effects of its actions on listed species."  67 Fed. Reg. 71549, 71552 (Dec. 2, 2002).

## FACTUAL BACKGROUND

I.    ATRAZINE IS A WIDESPREAD AND TOXIC ENVIRONMENTAL
CONTAMINANT.

27.    Atrazine is heavily used throughout the country.  EPA first registered atrazine in 1958

and is in the process of reregistering atrazine pursuant to FIFRA section 4.  Atrazine is

one of the most widely used herbicides in the United States, with approximately 64

million to 76 million pounds of active ingredient applied annually.  *See* EPA, *Interim*

*Reregistration Eligibility Decision for Atrazine,* at 11 (Jan. 31, 2003) (hereinafter

"Atrazine IRED").  It is used on major food crops such as corn, soybeans, and sugarcane,

as well as non-crop areas such as golf courses and residential developments, across the

United States.  *Id.*  Atrazine is applied directly to the soil during crop pre-planting and

pre-emergence.

28.    EPA's approval of atrazine use results in widespread environmental contamination.

Atrazine is both persistent (half-life can be as long as several years, depending on

climate) and mobile in surface and ground water.  Predictably, the heavy use of atrazine

causes significant environmental contamination.  Atrazine contamination of air, water,

and rainfall occurs through leaching, runoff, and spray drift.  Regarding surface and

ground water contamination, EPA states that "[b]ecause of its persistence and mobility,

atrazine is *expected* to reach surface and ground water.  This is confirmed by widespread

detections of atrazine in surface water and ground water."  EPA, *Atrazine, Reregistration*

*Eligibility Science Chapter, Environmental Fate and Effects Chapter*, at 19 (April 22,

2002) (hereinafter "Atrazine EFEC") (emphasis added).

29.     EPA has found that there is "widespread environmental exposure" to atrazine in aquatic

        communities and other ecosystems.  Atrazine EFEC at 2, 19.  Atrazine has been "widely

        detected" in air and rainfall samples in both high-use areas and areas far removed from

        high-use areas.  *See* Atrazine IRED at 52; Atrazine EFEC at 2, 19.  Because atrazine is

        used primarily during crop pre-planting and pre-emergence, the levels of use are highest

        during the Spring.

30.     A review of U.S. Geological Survey stream monitoring data shows frequent detections of

        atrazine in surface water in many states, at levels above those that may harm wildlife and

        habitat.  EPA admits that these frequent and significant detections are likely to

        underestimate atrazine levels in streams.  *See* Atrazine EFEC at 4.

II.     EPA'S ONGOING ATRAZINE REGISTRATION JEOPARDIZES ENDANGERED
        SPECIES AND THEIR HABITAT.

31.     Atrazine is a toxic pesticide that poses risks to many species.  EPA's risk assessments

        acknowledge potential harmful effects of atrazine – both directly and indirectly – on

        endangered fish, aquatic invertebrates, terrestrial plants, and aquatic plants.  Further data

        reviewed and summarized by EPA show that atrazine also may adversely affect

        endangered amphibians and reptiles.

32.     A number of agencies have identified atrazine as an endocrine disrupter, including the

        United Kingdom's Environmental Agency, the European Union, the Oslo and Paris

        Commission Convention for the Protection of the Marine Environment of the North-East

        Atlantic, and the State of Illinois.  There is evidence for at least two mechanisms of

        endocrine disruption activity.  Atrazine has been shown to disrupt the hypothalamic-

        pituitary-gonadal axis, resulting in abnormal levels of prolactin and leutenizing hormone,

which are required for normal reproduction and lactation.  In addition, there is some

evidence that atrazine stimulates aromatase activity, which in turn increases endogenous

conversion of androgens to estrogens.

33.     Lab experiments and field studies using frogs demonstrate that atrazine alters gonadal

development, with results including feminization and hermaphroditism of frogs.  These

effects occur at very low doses – at or below levels commonly found in the environment.

EPA's risk assessment discusses atrazine's effects on tadpoles and the concern that this

raises about adverse effects on amphibian reproduction.  Studies have also found adverse

developmental effects of atrazine in reptiles and fish.

34.     Atrazine use results in exposure that exceeds EPA's levels of concern for endangered

terrestrial plants and aquatic vascular plants.  Atrazine EFEC at 94; Atrazine IRED at 56

("Endangered species exceedances for direct effects on terrestrial plants indicate potential

risks to endangered species. . . .  The level of concern for endangered terrestrial plant

species is exceeded for both monocots and dicots.").  Atrazine's registration also exceeds

acute levels of concern for endangered aquatic invertebrates (such as freshwater mussels),

and exceeds chronic levels of concern for fish and aquatic invertebrate reproduction.

Atrazine EFEC at 95; Atrazine IRED at 59, 66.  Furthermore, EPA acknowledges that

atrazine may adversely affect endangered birds, mammals, and beneficial insects

indirectly, through loss of food sources and habitat disruption caused by atrazine's

adverse chronic effects on terrestrial and aquatic plants.  *See* Atrazine EFEC at 94.

Adverse effects of atrazine on aquatic vegetation may cause a loss of vegetative habitat

that could adversely affect populations of endangered aquatic invertebrates and endangered fish species.  *Id.* at 95.

35.    Atrazine runoff often causes high-level pulses in surface water, and for a developmental toxicant and endocrine disruptor such as atrazine, short-term exposures to high levels are a significant concern.  Irreversible effects can occur after relatively brief exposures during vulnerable developmental periods for many species.  The laboratory, microcosm, mesocosm, and field studies used by EPA "suggest that atrazine concentrations measured in the environment could reach levels that are likely to have negative impact on sensitive aquatic species and communities."  Atrazine IRED at 61.

36.    The U.S. Fish and Wildlife Service submitted extensive comments to EPA in response to EPA's atrazine environmental risk assessment.  Those comments notified EPA that atrazine's release into the environment may have significant adverse effects on endangered species.  FWS concluded: "it does not appear that EPA will be able to fulfill its legal responsibilities under section 7(a)(2) of the Endangered Species Act to ensure that its proposed re-registration action is not likely to jeopardize the continued existence of listed species or destroy or adversely modify designated critical habitat."  *See* Letter from Everett Wilson, Chief, Division of Environmental Quality, FWS, to Kimberly Nesci Lowe, EPA, at 7 (June 27, 2002).

III.    ATRAZINE MAY ADVERSELY AFFECT ENDANGERED SPECIES IN THE CHESAPEAKE BAY WATERSHED.

37.    Atrazine's continued registration may jeopardize the survival and recovery of six endangered species in the Chesapeake Bay and its watershed: the loggerhead turtle,

leatherback turtle, green turtle, Kemp's ridley turtle, shortnose sturgeon, and dwarf

wedge mussel.

38.     Atrazine is heavily used and commonly detected in the Chesapeake Bay watershed.

Recent studies have found concentrations of atrazine in surface water throughout the

Chesapeake Bay watershed above levels associated with detrimental impacts to these

endangered turtles, fish, and mussels.

39.     The leatherback, loggerhead, Kemp's ridley, and green turtle are endangered sea turtles

that generally occur throughout the lower Chesapeake Bay and the estuarine parts of its

major tributaries.  Atrazine may directly impact these endangered turtles by acting as an

endocrine disrupter.  Atrazine may also indirectly affect these endangered turtles through

habitat disruption and loss of food supply.  Habitat degradation is considered a major

threat to endangered turtles, and FWS and EPA have both concluded that atrazine may

have significant adverse effects on the suitability of aquatic habitats for endangered as

well as other species.

40.     The shortnose sturgeon is an endangered fish found in the upper portions of the

Chesapeake Bay – including the mouth of the Susquehanna River, near the Chesapeake &

Delaware Canal, and Kent Island – and in the lower portions of the Bay in the Potomac

River.  The shortnose sturgeon is migratory and spends time in rivers and downstream

estuaries.  Sturgeon populations are found in areas that have known concentrations of

atrazine, detected at levels above those that EPA estimates cause reductions in fish

populations through food loss and habitat damage.

41.   Populations of the endangered dwarf wedge mussel are found in five Maryland counties

where atrazine is used – St. Mary's, Talbot, Queen Anne's, Caroline, and Charles – and

in the Choptank River and its drainage.  Atrazine levels in these areas have been

measured well in excess of those that cause both direct and indirect harm to mussels.  The

dwarf wedge mussel is highly susceptible to anthropogenic impacts because it is

sedentary and unable to remove itself from degraded environments.

IV.    ATRAZINE MAY ADVERSELY AFFECT ENDANGERED SPECIES IN THE
       MIDWEST.

42.   Atrazine's continued registration may jeopardize the survival and recovery of five

endangered species in the Midwest: the pallid sturgeon, Topeka shiner, fat pocketbook

pearly mussel, purple cat's paw pearly mussel, and northern riffleshell.

43.   Atrazine is heavily used and commonly detected throughout the Midwest.  A significant

amount of the tens of millions of pounds of atrazine applied annually is concentrated in

the Midwestern states of Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota,

Missouri, Nebraska, North Dakota, Ohio, South Dakota, and Wisconsin, within the

watershed of the Mississippi and Missouri Rivers, and the Green River in Kentucky.

44.   EPA references a number of studies that detect potentially harmful levels of atrazine in a

significant percentage of several hundred Mid-Western streams and in rainfall samples

throughout the Midwest.  *See, e.g.*, Atrazine EFEC at 4.  Other water monitoring data

submitted to EPA shows annual mean atrazine detections at surprisingly high levels

throughout the Midwest.  As annual mean detection rates, these numbers reflect likely

much higher pulses of atrazine during heavy application periods.  U.S. Geological Survey

water monitoring data for these Midwestern states also detects atrazine in surface water

significantly above levels that may adversely affect endangered species, demonstrating

extensive contamination of aquatic habitat in the Midwest.

45. By far the highest-volume crop use for atrazine in the Midwest is corn, and, according to

EPA, "modeling simulations for corn show that atrazine concentrations in ponds exceed

the levels at which studies have shown reductions in fish populations, invertebrate

populations, macrophytes, and primary production *in 70 to 83 % of the years*."  Atrazine

EFEC at 3 (emphasis added).

46. The pallid sturgeon is an endangered fish that was listed under the ESA in 1990.  The

pallid sturgeon is at risk throughout its entire range, including the Missouri River and the

Mississippi River below the Missouri River, in Illinois, Indiana, Iowa, Kansas, Kentucky,

Missouri, Nebraska, North Dakota, and South Dakota.  Spawning reportedly occurs

between June and August, and potentially harmful levels of atrazine are commonly

detected in May, June, and as late as July in Midwestern states.  FWS lists habitat loss

and agricultural pollution as threats to the survival of the pallid sturgeon, and cites

remediating sources of environmental contaminants as an important component of pallid

sturgeon recovery.  FWS also notes that ESA section 7 consultation will play a major role

in the protection and recovery of pallid sturgeon.  EPA has concluded that approved

atrazine uses in the Midwest exceed levels of concern for endangered fish.

47. The Topeka shiner is an endangered fish, listed in 1998, and found in tributary streams in

the Kansas and Cottonwood river basins in Kansas; the Missouri, Grand, Chariton, and

Des Moines river basins in Missouri; the North Raccoon and Rock river basins in Iowa;

the James, Big Sioux, and Vermillion river watersheds in South Dakota; and the Rock

and Big Sioux river watersheds in Minnesota.  The fish was historically present in

Nebraska as well.  Topeka shiners most often occur in pool and run areas of streams –

where atrazine concentrations are likely to be higher.  FWS found that pesticide runoff is

a threat to the survival of the Topeka shiner, and cites section 7 consultation for EPA

pesticide registrations as an important recovery objective, in order to identify and reduce

pesticide impacts on the Topeka shiner.

48.     Several endangered freshwater mussels are found in the Midwest.  The fat pocketbook

pearly mussel is found in rivers in Indiana, Kentucky, and Missouri; the purple cat's paw

pearly mussel is found in the Green River in Kentucky and historically known in the

Ohio River basin in Ohio, Indiana, and Illinois; and the northern riffleshell is found in

river systems in Ohio, Kentucky, and Western Pennsylvania.  Typical and approved

atrazine use rates exceed EPA's levels of concern for endangered freshwater mussels and

the aquatic vegetation that may provide freshwater mussel habitat.  Pesticide

contamination through agricultural runoff is linked to mussel mortality or die-offs in the

Midwest.

V.      EPA MAY ADVERSELY AFFECT ENDANGERED SPECIES IN THE SOUTH.

49.     Atrazine's continued registration may jeopardize the survival and recovery of ten

endangered species in the South: the Barton Springs salamander, Alabama sturgeon, pink

mucket pearly mussel, shiny pigtoe pearly mussel, fine-rayed pigtoe mussel, rough pigtoe

mussel, heavy pigtoe mussel, ovate clubshell mussel, southern clubshell mussel, and

stirrup shell mussel.

50.     Atrazine is heavily used and commonly detected throughout the South.  Environmental
        atrazine contamination is a significant problem in the Southern states of Alabama,
        Arkansas, Florida, Georgia, Louisiana, Mississippi, and Texas.  Water monitoring data
        submitted to EPA shows high annual mean detection rates across the South, which reflect
        higher pulses of atrazine during heavy application periods.  U.S. Geological Survey water
        monitoring data for these Southern states also detects atrazine at levels harmful to
        endangered species.  This monitoring data collectively shows significant and likely
        harmful contamination of aquatic habitat in the South.

51.     The Barton Springs salamander is an entirely aquatic species found in Barton Springs, the
        fourth largest spring in Texas.  Degradation of water quality in Barton Springs, caused
        partly by herbicide runoff from golf courses and residential areas, is a significant threat to
        the Barton Springs salamander.  The Barton Springs salamander may be particularly
        vulnerable to atrazine exposure because amphibians are known to be very sensitive to
        environmental contaminants, and amphibians' health can suffer from exposure to
        pesticides in particular.  FWS states that atrazine has been found in spring habitat of the
        Barton Springs salamander in downtown Austin, Texas – a finding that it believes may be
        "significant" in light of recently published research documenting detrimental effects of
        low-level atrazine exposure in frogs.

52.     The endangered Alabama sturgeon is found in the lower Alabama River and threatened
        by agricultural runoff.  Typical and approved atrazine use rates exceed EPA's chronic
        levels of concern for endangered fish and may adversely affect the Alabama sturgeon.

53.     A number of endangered freshwater mussels are found in Alabama.  The endangered pink

mucket pearly mussel, shiny pigtoe pearly mussel, fine-rayed pigtoe mussel, rough pigtoe

mussel, heavy pigtoe mussel, ovate clubshell mussel, southern clubshell mussel, and

stirrup shell mussel are each found in Alabama counties in which U.S. Geological Survey

atrazine detections show extremely heavy atrazine contamination.  Atrazine use rates

exceed EPA's levels of concern for endangered freshwater mussels and the aquatic

vegetation that may provide freshwater mussel habitat, and atrazine surface water

detections in the Alabama counties where these endangered mussels are found far exceed

levels known to cause direct and indirect harm to mussels.

## NATURE OF THE LEGAL VIOLATION

54.     EPA's continued registration of atrazine for use likely causes significant adverse effects

and potential jeopardy to the loggerhead turtle, leatherback turtle, green turtle, Kemp's

ridley turtle, shortnose sturgeon, and dwarf wedge mussel in the Chesapeake Bay; the

pallid sturgeon, Topeka shiner, fat pocketbook pearly mussel, purple cat's paw pearly

mussel, and northern riffleshell in Midwestern rivers and their tributaries; and the Barton

Springs salamander, Alabama sturgeon, pink mucket pearly mussel, shiny pigtoe pearly

mussel, fine-rayed pigtoe mussel, rough pigtoe mussel, heavy pigtoe mussel, ovate

clubshell mussel, southern clubshell mussel, and stirrup shell mussel in the South.

55.     Based on atrazine monitoring data, EPA's atrazine risk assessments, the comments and

determinations of the FWS and NMFS, and additional data presented to the agency, EPA

cannot ensure that atrazine's registration will not jeopardize the continued existence of

these endangered species or destroy or adversely modify their critical habitat.  EPA has

not consulted with FWS or NMFS despite significant detections of atrazine in the habitat of these species and the acknowledged potential for adverse effects of atrazine on these species.

56.   NRDC's members reside in and use areas within the Chesapeake Bay watershed, the Missouri, Mississippi, and Green Rivers and their tributaries, Barton Springs, the Alabama River and other rivers and streams in Alabama, and within the habitat of these endangered species.  EPA's failure to consult in order to prevent jeopardy to these species hampers the ability of NRDC's members to observe and enjoy wildlife and recreation within these areas.  The lack of consultation may increase the rate of extinction of these endangered species, and is likely to destroy or adversely affect the habitat of these species and the scenery within the Chesapeake Bay, Missouri River, Mississippi River, Green River, Barton Springs, Alabama River, and elsewhere within the affected areas.  This has harmed and continues to harm NRDC's members.

57.   EPA has found that its registration of atrazine causes significant and widespread environmental contamination.  EPA is aware that this contamination is frequently detected at levels above those that cause harm to endangered species.  And EPA has concluded that endangered species may be in jeopardy as a result of the agency's actions and failure to consult with FWS and NMFS.

**CLAIM FOR RELIEF**

COUNT ONE: VIOLATION OF ESA SECTION 7(a)(2)

EPA HAS FAILED TO CONSULT REGARDING THE EFFECTS OF ITS CONTINUED
ATRAZINE REGISTRATION ON ENDANGERED SPECIES

58.   Plaintiff NRDC incorporates all preceding paragraphs as if fully set forth herein.

59.     Section 7(a)(2) of the ESA prohibits agency actions that jeopardize the survival of

endangered species or that destroy or adversely modify their critical habitat.  16 U.S.C. §

1536(a)(2).  To assist in complying with this duty, federal agencies, like EPA, must

consult with FWS or NMFS whenever they take an action that "may affect" an

endangered species or the species' critical habitat.  16 U.S.C. § 1536(a)(2); 50 C.F.R. §

402.14(a).  Under ESA implementing regulations, section 7 applies "to all actions in

which there is discretionary Federal involvement or control."  50 C.F.R. § 402.02.

60.     EPA retains discretionary involvement and control over its atrazine registration.  It can

exercise that involvement and control, *inter alia*, through the FIFRA section 4

reregistration process, through FIFRA section 3 registration review, through the call-in of

new data, through cancellation notices, and through suspension actions.  Atrazine's

pesticide registration constitutes agency action subject to ESA section 7(a)(2)'s

consultation duty.

61.     Use of atrazine in accordance with its current EPA registration "may affect" the

endangered loggerhead turtle, leatherback turtle, green turtle, Kemp's ridley turtle,

shortnose sturgeon, dwarf wedge mussel, pallid sturgeon, Topeka shiner, fat pocketbook

pearly mussel, purple cat's paw pearly mussel, northern riffleshell, Barton Springs

salamander, Alabama sturgeon, pink mucket pearly mussel, shiny pigtoe pearly mussel,

fine-rayed pigtoe mussel, rough pigtoe mussel, heavy pigtoe mussel, ovate clubshell

mussel, southern clubshell mussel, and stirrup shell mussel or their habitat.

62.     Atrazine has been detected in the habitat for these species at levels associated with

detrimental impacts and is likely to adversely affect these endangered species.

63.     EPA has a legal obligation to initiate consultation on atrazine uses that may affect these

        endangered species or their habitat under ESA section 7(a)(2).  Without such

        consultation, EPA cannot discharge its obligation to ensure that atrazine used in

        accordance with its EPA registration will not jeopardize the survival of these endangered

        species.

64.     EPA has not consulted with FWS or NMFS on the impacts of atrazine uses in accordance

        with the existing EPA registration on these endangered species or their habitat.

65.     EPA is violating section 7(a)(2) of the ESA, 16 U.S.C. § 1536(a)(2), and its

        implementing regulations, 50 C.F.R. Part 402, by failing to consult with FWS and NMFS

        regarding the effects of atrazine use under its EPA pesticide registration that "may affect"

        these endangered species.

## REQUEST FOR RELIEF

In the absence of injunctive relief, Plaintiff and its members will continue to suffer injury caused

by EPA's failure to comply with its obligations under the Endangered Species Act.


WHEREFORE, Plaintiff respectfully requests that the court enter judgment providing for the

following relief, and such other additional relief that the court deems appropriate:


66.     Declare that EPA is violating ESA section 7(a)(2) by failing to consult with NMFS and

        FWS on the effects of EPA's pesticide registration for atrazine that "may affect" the

        endangered loggerhead turtle, leatherback turtle, green turtle, Kemp's ridley turtle,

        shortnose sturgeon, dwarf wedge mussel, pallid sturgeon, Topeka shiner, fat pocketbook

pearly mussel, purple cat's paw pearly mussel, northern riffleshell, Barton Springs

salamander, Alabama sturgeon, pink mucket pearly mussel, shiny pigtoe pearly mussel,

fine-rayed pigtoe mussel, rough pigtoe mussel, heavy pigtoe mussel, ovate clubshell

mussel, southern clubshell mussel, and stirrup shell mussel.

67.   Order EPA to begin consulting with FWS and NMFS pursuant to ESA section 7(a)(2) on

the effects of EPA's atrazine registration that "may affect" these endangered species, and

direct EPA to ensure that it conducts the consultations in a manner that addresses the

most significant threats posed to these species by atrazine use in an expeditious fashion.

68.   Enjoin EPA from authorizing uses of atrazine that may affect these endangered species

until the consultation process has been completed and EPA has brought its atrazine

registration into compliance with ESA section 7(a)(2).

69.   Award Plaintiff NRDC their costs of litigation, including attorneys' and expert witness

fees, pursuant to 16 U.S.C. § 1540(g)(4).

70.   Grant Plaintiff NRDC such additional and further relief as the Court may deem just and

appropriate.


Respectfully submitted,


_____/S/_____
Terry J. Harris, Maryland Bar # 26726
Law Offices of Terry J. Harris
301 N. Charles Street
Suite 902
Baltimore, MD 21201
ph:     (410) 576-0800
fax:    (410) 547-6655

Rena Steinzor
Director, Univ. of Maryland Environmental Law Clinic
University of Maryland School of Law
515 W. Lombard Street
Baltimore, MD  21201
ph:      (410) 706-0564
fax:     (410) 706-2184

Aaron Colangelo
Natural Resources Defense Council
1200 New York Ave, NW, Suite 400
Washington, DC 20005
ph:      (202) 289-6868
fax:     (202) 289-1060

Counsel for Plaintiff NRDC

Dated:  August 20, 2003